JEFFREY S. SHINBROT, ESQ. (SBN 155486)
jeffrey@shinbrotfirm.com
JEFFREY S. SHINBROT, APLC
8200 Wilshire Boulevard, Suite 400
Beverly Hills, California 90211
Telephone:  (310) 659-5444
Fax (310) 878-8304

Attorneys for Chapter 11 Debtor
Ronald Leon

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>RONALD LEON,<br><br>              Debtor | Bk. No. 2:16-bk-15122-WB<br><br>In a Case Under Chapter<br>11 of the Bankruptcy Code<br>(11 U.S.C. § 1101 *et seq.*)<br><br>**DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN**<br><br>Disclosure Statement Hearing<br><br>Date:        December 8, 2016<br>Time:       10:00 a.m.<br>Ctrm:      Courtroom 1375<br>              255 E. Temple Street<br>              Los Angeles, CA<br><br>Plan Confirmation Hearing<br><br>Date:        March 30. 2017<br>Time:       10:00 a.m.<br>Ctrm:      Courtroom 1375<br>              255 E. Temple Street<br>               Los Angeles, CA |

# TABLE OF CONTENTS

I. INTRODUCTION ....................................................................................................... 3

II. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .................... 3

    A.     General Overview .............................................................................. 3

    B.     Unclassified Claims ........................................................................... 3

         1.     Administrative Expenses ....................................................... 3

         2.     Priority Tax Claims ................................................................ 4

    C.     Classified Claims and Interests .......................................................... 5

         1.     Classes of Secured Claims .................................................... 5

         2.     Classes of Priority Unsecured Claims ................................... 7

         3.     Class of General Unsecured Claims ....................................... 8

         4.     Class(es) of Interest Holders ................................................. 8

    D.     Means of Performing the Plan ............................................................ 9

         1.     Funding for the Plan .............................................................. 9

         2.     Post-Confirmation Management ............................................ 9

         3.     Disbursing Agent ................................................................... 9

         4.     Risk Factors …………………………………………….................... 9

III. TREATMENT OF MISCELLANEOUS ITEMS ......................................................... 9

    A.     Executory Contracts and Unexpired Leases ...................................... 9

         1.     Assumptions .......................................................................... 9

         2.     Rejections ............................................................................ 10

    B.     Changes in Rates Subject to Regulatory Commission Approval ...................... 10

    C.     Retention of Jurisdiction .................................................................. 10

    D.     Tax Consequences of Plan ……………………………………………..…..10

IV. EFFECT OF CONFIRMATION OF PLAN ................................................................................... 11

    A.     Discharge ................................................................................................. 11

    B.     Revesting of Property in the Debtor ........................................................ 11

    C.     Modification of Plan ................................................................................ 11

    D.    Post-Confirmation Status Report ............................................................ 11

    E.     Quarterly Fees ........................................................................................ 11

    F.     Post-Confirmation Conversion/Dismissal .............................................. 12

    G.    Final Decree ............................................................................................ 12

EXHIBIT 1- STIPULATION WITH HSBC……………………………….................................14

EXHIBIT 2-PROPOSED LEASE WITH HECTOR SOBALVARRO……………………….......47

EXHIBIT 3-PROPOSED LEASE WITH ERIC TUPKER……………………………………...51

# I.

## INTRODUCTION

RONALD LEON is the Debtor ("Debtor") in a Chapter 11 bankruptcy case.  On April 20, 2016, the Debtor commenced a bankruptcy case by filing a voluntary Chapter 11 bankruptcy petition under the United States Bankruptcy Code ("Code"), 11 U.S.C. § 101 *et seq.*, Chapter 11 allows the Debtor, and under some circumstances, creditors and other parties in interest, to propose a plan of reorganization ("Plan").  The Plan may provide for the Debtor to reorganize by continuing to operate, to liquidate by selling assets of the estate, or a combination of both.

This is a reorganizing plan.  In other words, the Proponent seeks to accomplish payments under the Plan by restructuring the loans secured by his residence, paying unsecured creditors over time, and contributing new value of $35,000.  The Effective Date of the proposed Plan is 14 days after entry of an order confirming the Plan.

# II.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**A.    General Overview**

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority of payments as provided in the Bankruptcy Code.  The Plan states whether each class of claims or interests is impaired or unimpaired.  The Plan provides the treatment each class will receive under the Plan.

**B.    Unclassified Claims**

Certain types of claims are not placed into voting classes; instead they are unclassified.  They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code.  As such, the Proponent has <u>not</u> placed the following claims in a class.  The treatment of these claims is provided below.

**1.    Administrative Expenses**

Administrative expenses are claims for costs or expenses of administering the Debtor's Chapter 11 case which are allowed under Code Section 507(a)(1).  The Code requires that all

administrative claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

The following chart lists <u>all</u> of the Debtor's § 507(a)(1) administrative claims and their treatment under this Plan.

| <u>Name</u> | <u>Amount Owed</u> | <u>Treatment</u> |
|---|---|---|
| Jeffrey S. Shinbrot, Esq. | $25,000 | Paid in Full on Effective Date |
| Hahn & Fife, LLP, CPA | $10,000 | Paid in Full on Effective Date |
| Clerk's Office Fees | $0 | Paid in Full on Effective Date |
| Office of the U.S. Trustee Fees | $650.00 | Paid in Full on Effective Date |
|  | TOTAL = $35,650.00 |  |

<u>Court Approval of Fees Required:</u>

The Court must approve all professional fees listed in this chart. For all fees except Clerk's Office fees and U.S. Trustee's fees, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application. Only the amount of fees allowed by the Court will be required to be paid under this Plan.

## 2.    Priority Tax Claims

Priority tax claims are certain unsecured income, employment and other taxes described by Code Section 507(a)(8). The Code requires that each holder of such a 507(a)(8) priority tax claim receive the present value of such claim in deferred cash payments, over a period not exceeding six years from the date of the assessment of such tax.

The following chart lists <u>all</u> of the Debtor's Section 507(a)(8) priority tax claims and their treatment under this Plan:

///

///

| Description | Amount Owed | Treatment |
|---|---|---|
| United States Department of Treasury, Internal Revenue Service, (priority portion of income taxes owed for years 2011,2012,2013,2014, and 2015. | $74,096.71 | • Monthly<br>• $1,698.21 (includes 4% interest)<br>• Payable within 5 years from the date of the Petition.<br>• First Payment: March 1, 2017<br>• Last Payment: March 1, 2021 |
| Franchise Tax Board (priority portion of income taxes owed for years 2013, 2014, and 2015). | $20,521.92 | • Monthly<br>• $470.34 (includes 4% interest)<br>• Payable within 5 years from the date of the Petition.<br>• First Payment: March 1, 2017<br>• Last Payment: March 1, 2021 |

**C.    Classified Claims and Interests**

**1.    Classes of Secured Claims**

Secured claims are claims secured by liens on property of the estate.  The following chart lists all classes containing Debtor's secured pre-petition claims and their treatment under this Plan:

| CLASS # | DESCRIPTION | INSIDERS (Y/N) | IMPAIRED (Y/N) | TREATMENT | |
|---|---|---|---|---|---|
| 1 | Secured claim of:<br>• Name =HSBC Bank USA, National Association, as Trustee for Wells Fargo Asset Securities Corporation, Mortgage Pass-Through Certificates, Series 2007-2 ("HSBC")<br>• Collateral description = 849 Lincoln Avenue, Pasadena, CA 91103<br>• Collateral value | N | Y | The principal portion of this loan will be paid pursuant to the pre-Petition agreement between the Debtor and HSBC<br><br>• Pymt interval<br>• Pymt amt | • Monthly<br><br>• 6444.02 (which is comprised of $5,312.50 monthly |

| | | | | | |
|---|---|---|---|---|---|
| | = $1,200,000.00<br>• Priority of security int. = first priority lien<br>• Principal owed = $1,077,000.00 (plus arrears of $307,685.03 treated below). | | | | mortgage payment, plus $1,131.52 for insurance and property taxes) |
| | | | | • Balloon pymt<br>• Interest rate %<br><br>• Treatment of Lien | • None<br>• Variable, currently 6.25%<br><br>• Retain Lien |
| | • Arrears portion of HSBC in the amount of $307,685.03 | | | Arrears to be paid monthly for 84 months at $3,662.93 per month (in addition to principal amount set forth above). | |
| | | | | • Payment | • $3,662.92 |
| | | | | • Begin date<br>• End date<br>• Interest rate %<br>• Total payout 100%<br>Treatment of Lien | • 1/1/2017<br>• 12/1/2023<br>• 0.00<br><br>• $307,685.03,<br><br>• Retain Lien<br>The Court has approved the Stipulation between HSBC and the Debtor, the Stipulation is annexed hereto as Exhibit "1." |

| 2 | Undersecured claim of:<br><br>• Name = Wells Fargo NV NA<br><br>• Collateral description = 849 Lincoln Avenue, Pasadena, CA 91103<br><br>• Collateral value = $1,200,000.00<br><br>• Priority of security int. = second<br><br>• Principal owed = $511,144.08<br><br>• Pre-pet. arrearage amount = $0<br><br>• Post-pet. arrearage amount = $0<br><br>• Total claim amount = $511,144.08 | N | Y | | This lien is wholly unsecured and uncollectable as creditor voluntarily charged the debt off. This claim shall be fully void, discharged and released against the Subject Property entry of a chapter 11 discharge of the Debtor. |
| 3 | IRS-secured portion of claim $28,363.72 | N | Y | • Payment<br><br>• Begin date<br><br>• End date<br><br>• Interest rate %<br><br>• Total payout 100% | $650.06<br><br>March 1, 2017<br><br>March 1, 2021<br><br>4%<br><br><br>$31,853.16 |

## 2.    Classes of Priority Unsecured Claims

Certain priority claims that are referred to in Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes.  These types of claims are entitled to priority treatment as follows: the Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim.  However, a class of unsecured priority claim holders may vote to

accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claims.

The following chart lists all classes containing Debtor's 507(a)(3), (4), (5), (6), and (7) priority unsecured claims and their treatment under this Plan: None.

### 3.    Class of General Unsecured Claims

General unsecured claims are unsecured claims not entitled to priority under Code Section 507(a). The following chart identifies this Plan's treatment of the class containing <u>all</u> of Debtor's general unsecured claims:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT | |
|---|---|---|---|---|
| 4 | General unsecured claims<br><br>• Total amt of claims =<br><br>See Exhibit D for a detailed list includes unsecured portion of FTB in the amount of $2,549.58; IRS in the amount of $10,606.98 and general unsecured claims of $15,941.62 | Y | • Pymt interval<br>• Pymt amount<br>• Begin date<br>• End date<br>• Interest rate %<br>• Interval<br>• Payment<br>• Payout (55%) | = quarterly<br>= 1,000.00<br>= 6/1/2017<br>= 04/1/2021<br>= none<br>quarterly<br>= $485.00<br>=$16,000.00 |

### 4.    Class(es) of Interest Holders

Interest holders are the parties who hold ownership interest (i.e., equity interest) in the Debtor. If the Debtor is a corporation, entities holding preferred or common stock in the Debtor are interest holders. If the Debtor is a partnership, the interest holders include both general and limited partners.

If the Debtor is an individual, the Debtor is the interest holder.  The following chart identifies this Plan's treatment of the class of interest holders:

| CLASS # | DESCRIPTION | IMPAIRED (Y/N) | TREATMENT |
|---------|-------------|----------------|-----------|
| 5 | Interest holders- the Debtor, Ronald Leon | N | Debtor shall retain all assets |

**D.    Means of Performing the Plan**

    **1.    Funding for the Plan**

The plan will be funded by the following: Debtor's $50,000 cash on hand, $35,000 contribution from Pasadena Concrete Works, Debtor's income and rental income.

    **2.    Post-Confirmation Management**

The Debtor will manage his business post-petition.

    **3.    Disbursing Agent**

The Debtor shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan. The Disbursing Agent shall serve without bond and shall receive no compensation for distribution services rendered and expenses incurred pursuant to the Plan.

    **4. Risk Factors**

The proposed plan has the following risks:  The Plan carries the risk that the Debtor's business will not generate and pay to him the expected amount of income.

**III.**

**TREATMENT OF MISCELLANEOUS ITEMS**

**A.    Executory Contracts and Unexpired Leases**

    **1.    Assumptions**

The following are the unexpired leases and executory contracts to be assumed as obligations of the reorganized Debtor under this Plan: The Debtor has entered into a proposed lease with Hector Sobalvarro (Exhibit 2 hereto) and Eric Tupker (Exhibit 3 hereto) and requests that the Court approve each lease.

On the Effective Date, each of the unexpired leases and executory contracts listed above shall be assumed as obligations of the reorganized Debtor.  The Order of the Court confirming the Plan shall constitute an Order approving the assumption of each lease and contract listed above.  If you are a party to a lease or contract to be assumed and you object to the assumption of your lease or contract, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan. See Section {I.B.3.} of this document for the specific date..

### 2.    Rejections

On the Effective Date, the following executory contracts and unexpired leases will be rejected: None.

The order confirming the Plan shall constitute an Order approving the rejection of the lease or contract.  If you are a party to a contract or lease to be rejected and you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.  See Section {I.B.3.} of this document for the specific date.

**B.    Changes in Rates Subject to Regulatory Commission Approval**

This Debtor is not subject to governmental regulatory commission approval of its rates.

**C.    Retention of Jurisdiction**

The Court will retain jurisdiction to the extent provided by law.

**D.    Tax Consequences of Plan**

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues this Plan may present to the Debtor.  The Proponent CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all the tax implications of any action.

The following are the tax consequences which the Plan will have on the Debtor's tax liability: The Debtor does not anticipate any tax consequences.

**IV.**

**EFFECT OF CONFIRMATION OF PLAN**

**A.    Discharge**

This Plan provides that upon substantial consummation of the Plan and entry of a final decree by the Court, Debtor shall be discharged of liability for payment of debts incurred before confirmation of the Plan, to the extent specified in 11 U.S.C. § 1141.  However, the discharge will not discharge any liability imposed by the Plan.

**B.    Revesting of Property in the Debtor**

Except as provided in Section {IV.E.}, and except as provided elsewhere in the Plan, the confirmation of the Plan revests all of the property of the estate in the Debtor.

**C.    Modification of Plan**

The Proponent of the Plan may modify the Plan at any time before confirmation.  However, the Court may require a new disclosure statement and/or re-voting on the Plan if proponent modifies the plan before confirmation.

The Proponent of the Plan may also seek to modify the Plan at any time after confirmation so long as (1) the Plan has not been substantially consummated and (2) if the Court authorizes the proposed modifications after notice and a hearing.

**D.    Post-Confirmation Status Report**

Within 120 days of the entry of the order confirming the Plan, Plan Proponent shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan.  The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice.  Further status reports shall be filed every 120 days and served on the same entities.

**E.    Quarterly Fees**

Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) to date of confirmation shall be paid to the United States Trustee on or before the effective date of the plan.  Quarterly fees accruing under 28 U.S.C. § 1930(a)(6) after confirmation shall be paid to the United States Trustee in accordance with 28

U.S.C. § 1930(a)(6) until entry of a final decree, or entry of an order of dismissal or conversion to chapter 7.

**F.    Post-Confirmation Conversion/Dismissal**

A creditor or party in interest may bring a motion to convert or dismiss the case under § 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  If the Court orders, the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7, estate.  The automatic stay will be reimposed upon the revested property, but only to    the extent that relief from stay was not previously authorized by the Court during this case.

The order confirming the Plan may also be revoked under very limited circumstances.  The Court may revoke the order if the order of confirmation was procured by fraud and if the party in interest brings an adversary proceeding to revoke confirmation within 180 days after the entry of the order of confirmation.

**G.    Final Decree**

Once the estate has been fully administered as referred to in Bankruptcy Rule 3022, the Plan Proponent, or other party as the Court shall designate in the Plan Confirmation Order, shall file a motion with the Court to obtain a final decree to close the case.

DATED: 12/13/16

JEFFREY SHINBROT, APLC

By:/s/Jeffrey S. Shinbrot
    JEFFREY S. SHINBROT, Attorneys for
    Ronald Leon, Debtor in Possession

DATED: 12/13/16

Ronald Leon
Debtor in Possession

13
Third Amended Chapter 11 Plan

**EXHIBIT 1**

1  CHRISTOPHER M. MCDERMOTT (SBN 253411)
   cmcdermott@aldridgepite.com
2  TODD S. GARAN (CA SBN 236878)
   tgaran@aldridgepite.com
3  **ALDRIDGE PITE, LLP**
   4375 Jutland Dr., Ste. 200
4  P.O. Box 19734
   San Diego, CA 92177-9734
5  Telephone: (858) 750-7600
   Facsimile:  (619) 590-1385
6
   Attorneys for Secured Creditor:
7  HSBC Bank USA, National Association as
   Trustee for Wells Fargo Asset Securities
8  Corporation, Mortgage Pass-Through
   Certificates, Series 2007-2

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION**

| | |
|---|---|
| In re<br><br>RONALD LEON,<br><br>      Debtor and Debtor in<br>      Possession. | Case No. 2:16-bk-15122-WB<br><br>Chapter 11<br><br>**STIPULATION RE: TREATMENT OF CREDITOR'S CLAIM UNDER DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION**<br><br>SUBJECT PROPERTY:<br>849 Lincoln Avenue<br>Pasadena, CA 91103 |

This Stipulation Re: Treatment of Claim ("**Stipulation**") is entered into by and between Secured Creditor, HSBC Bank USA, National Association as Trustee for Wells Fargo Asset Securities Corporation, Mortgage Pass-Through Certificates, Series 2007-2; Wells Fargo Home Mortgage as servicer ("**Creditor**"), and Debtor, Ronald Leon ("**Debtor**"), by and through their respective attorneys of record.

The real property which is the subject of this matter is commonly known as 849 Lincoln Avenue, Pasadena, CA 91103 (hereinafter the "**Subject Property**"), which is more fully described in the Deed of Trust attached hereto as Exhibit B and incorporated herein by this reference.

/././

---

Claim Treatment Stipulation.v.1                                    Page - 1 -

*Creditor's Claim:*

The Loan is evidenced by a promissory note dated December 22, 2006, executed by Debtor and Maria Claudia Leon ("**Co-Borrower**") to Wells Fargo Bank, N.A. ("**Lender**") in the principal sum of $1,000,000.00 (the "**Note**"). A copy of the Note is attached hereto as **Exhibit A** and incorporated herein by this reference.

The Note is secured by a deed of trust (the "**Deed of Trust**") encumbering the Real Property located at 849 Lincoln Avenue, Pasadena, CA 91103 ("**Property**"). The Deed of Trust was duly recorded on December 29, 2006, in the Official Records of Los Angeles County, State of California. A copy of the Deed of Trust is attached hereto as **Exhibit B** and incorporated herein by this reference. The Note and Deed of Trust may be referred to collectively herein as the "**Loan**."

Subsequently, all of Lender's beneficial interest in the Loan was assigned and transferred to Creditor. The Note is endorsed in blank. A copy of the Assignment of Deed of Trust is attached hereto as **Exhibit C** and incorporated herein by this reference.

*The Bankruptcy Proceedings:*

On April 20, 2016, Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the Central District of California-Los Angeles Division and was assigned bankruptcy case no. 2:16-bk-15122-WB.

According to Debtor's Bankruptcy Petition and Schedules, the Subject Property has been identified as Debtor's principal residence and only real property asset. *See, Docket Number 1.*

Creditor filed a Proof of Claim against the Debtor's estate in the amount of $1,331,540.11, secured by the Subject Property, with pre-petition arrears in the amount of $254,652.52. (*See, Claim No.3.*)

**THE PARTIES STIPULATE AS FOLLOWS**:

1. Creditor's claim (is successors and/or assigns), secured by the Subject Property and Debtor's principal residence, is subject to the anti-modification provisions of 11 U.S.C. §1123(b)(5) and shall be fully secured, paid in full and Debtor' Plan shall not alter or modify the legal, equitable, and contractual rights under the Loan ("**Secured Claim**"). Creditor's Secured Claim shall be impaired pursuant to 11 U.S.C. §1124 only to the extent that Debtor shall cure the contractual

arrears as set forth herein.

2. <u>Contractual Payments</u>. Debtor shall tender regular monthly contractual payments to Creditor (and/or its servicer) on the first day of each month for the Secured Claim commencing January 1, 2017 and continuing on the first day of each month thereafter until the Maturity Date under the Loan when all outstanding amounts owed on the Secured Claim, including any escrow payments and/or charges as required per the terms and provisions of this Stipulation and/or the Loan, are to be paid in full. The amount of the current contractual monthly payment is $5,312.50.

3. <u>Escrow Payments</u>. In addition to contractual payment described in paragraph 2 of this Stipulation, Debtor shall tender to Creditor (and/or its servicer) all necessary escrow payments for any and all real property taxes and/or real property insurance advances as required by Creditor (and/or its servicer) and in accordance with any requirements under the Loan. Debtor shall tender the necessary escrow payments together with the regular monthly mortgage payments described in paragraph 2 above, commencing on January 1, 2017 and continuing on the first day of each month thereafter until the Maturity Date under the Loan at which time the Secured Claim, which includes any related escrow charges, must be paid in full. The current amount of the escrow payment is $1,131.52; however, Debtor understands the amount of this escrow payment is subject to change per any escrow analysis of Creditor (and/or its servicer).

4. <u>Cure of Contractual Arrears</u>. Debtor shall cure the total contractual arrears owing on Creditor's claim in the amount of $307,685.03, in equal monthly installments over 84 months without interest. Debtor shall tender arrearage payments in the amount of $3,662.92 per month commencing on the first day of the first month following entry of the order confirming Debtor' Plan, and continuing on the first day of each month thereafter for a period of 84 months at which time any outstanding contractual arrears owing on Creditor's claim as specified in this paragraph 4 are to be paid in full. If the Debtor seeks to sell or refinance the Subject Property any time prior to curing the contractual arrears as set forth herein, all outstanding contractual arrears must likewise be paid in full at the time of any such sale and/or refinancing. Notwithstanding the foregoing, if Debtor misses any regular contractual or escrow payment after January 1, 2017 as required herein, said missed payment shall not be subject to this paragraph 4, but instead shall be considered a default under this

Claim Treatment Stipulation.v.1                                          Page - 3 -

Stipulation and subject to any and all remedies hereunder, penalties, interest or other fees and charges as required under the Loan.

5.      Except as otherwise expressly provided herein, all remaining terms of the Note and Deed of Trust, which are incorporated herein by this reference, shall govern the treatment of Creditor's Secured Claim.

6.      <u>Pre-Confirmation Default</u>: In the event of any default on any of the provisions of this Stipulation prior to confirmation of Debtor's Chapter 11 Plan, Creditor (and/or its servicer) shall provide written notice, via certified mail, to Debtor at the Subject Property and to Debtor's attorney of record, indicating the nature of default. If Debtor fails to cure the default or payment default with certified funds after the passage of fourteen (14) calendar days from the date said written notice is placed in the mail as reflected on the certified receipt, Creditor may file and serve a declaration under penalty of perjury specifying the default, together with a proposed order Terminating the Automatic Stay, which the Court may grant without further notice or hearing, and Creditor (and/or its servicer) may commence any and all action necessary to obtain complete possession of the Subject Property under the terms of the Loan and applicable state law, including but not limited to foreclosure thereof, without further notice, order, or proceeding of this Court. In the event that Creditor is granted relief from the automatic stay, the parties hereby stipulate that the 14-day stay provided by Bankruptcy Rule 4001(a)(3) is waived.

7.      <u>Post-Confirmation Default</u>.  Upon confirmation of Debtor's Chapter 11 Plan, the Automatic Stay shall be deemed terminated as to the Creditor in all respects under the Bankruptcy Code, and Creditor shall no longer be required to comply with paragraph 6 above.  Instead, Creditor (and/or its servicer) will provide Debtor notice of any default related to the Stipulation in accordance with the Loan, and applicable state law and/or proceed with its remedies under the terms of the Loan and applicable state law, including but not limited to foreclosure of the Subject Property, without further notice, order, or proceeding of this Court.

8.      Any forbearance by Creditor (and/or its servicer) in exercising any right or remedy, including, without limitation, Creditor (and/or its servicer) accepting payments from third persons, entities or successors in interest to Debtor, or in amounts less than the amount due, including as

Claim Treatment Stipulation.v.1                                                                          Page - 4 -

provided for under this Stipulation, shall not be a waiver of or preclude the Creditor's (and/or servicer) exercise of any right or remedy under the Stipulation, and/or Loan. The acceptance by Creditor (and/or servicer) of a late or partial payment shall not act as a waiver of Creditor's right to proceed hereunder or under the Loan documents.

9.      In the event the Debtor defaults under this Stipulation and Creditor (and/or its servicer) forwards a default letter to Debtor, Debtor shall be required to tender Creditor's reasonable attorneys' fees and costs for each default letter submitted, in addition to the default amount stated therein, in order to cure the default. Any notice of default that Creditor (and/or its servicer) provides Debtor and/or Debtor's attorneys pursuant to this Stipulation shall not be construed as a communication under the Fair Debt Collection Practices Act, 15 U.S.C. §1692.

10.      The Debtor waives any and all claims, causes of action, whether known or unknown, he currently has as to Creditor's Proof of Claim, including Debtor's right to object to Creditor's Claim.

11.      In the event the Debtor seeks to sell the Subject Property at anytime prior to confirming his Chapter 11 Plan or if he seeks to sell the Subject Property through his Chapter 11 Plan, Creditor shall be entitled to credit bid at any such sale in an amount not less than the full unmodified, original outstanding balance owing under the terms of the Loan and/or exercise any of its rights pursuant to 11 U.S.C. §§ 363(b), (f) and (k) or 1129(b)(2)(A)(ii) as applicable, and shall be permitted to receive proceeds from the sale of the Subject Property in an amount not less than the full unmodified, original outstanding balance owing under the terms of the Loan at said time.

12.      Nothing herein shall preclude or prevent Debtor from seeking, or the parties from discussing a potential loan modification with respect to the Loan, or subsequently entering into such agreement with Creditor (and/or its servicer) prior to or after the confirmation of Debtor's Plan, which may supersede and/or replace the terms of this Stipulation. However, nothing in this Stipulation shall be construe to require or obligate Creditor (and/or its servicer) in any way to discuss, enter into, agree to enter into, offer or accept any such loan modification.

13.      Debtor shall attach a copy of this Stipulation to any Chapter 11 Plan filed in this case as an exhibit, including any amendments or modifications thereto, and said Plan shall expressly

Claim Treatment Stipulation.v.1                                          Page - 5 -

incorporate the terms and provisions of this Stipulation into Debtor's Chapter 11 Plan by reference (including any amended or modified Chapter 11 Plan).  In the event of a conflict between a provision of Debtor's Plan and the Stipulation, the Stipulation shall control.  Further, the terms and provisions of this Stipulation may not be modified, altered, or changed by any Chapter 11 Plan, including any subsequently filed amended or modified Chapter 11 Plan of Reorganization and/or confirmation order on the foregoing without the express written consent of the Creditor.

14.     In the event the Debtor's case is dismissed or converted to any other chapter under Title 11 of the United States Bankruptcy Code, Creditor shall retain its lien in the full, unmodified amount due under the Loan, Debtor will no longer be allowed to cure the delinquent contractual arrears as set forth herein, and the Automatic Stay shall be terminated without further notice, order or proceeding of the Court.

15.     In exchange for the forgoing, Creditor shall provide a ballot voting in favor of the Debtor's Chapter 11 Plan of Reorganization for the Secured Claim.

Dated: _____, 2016         JEFFREY S. SHINBROT, APLC


By: _____
         Jeffrey S. Shinbrot
         Attorney for Debtor

Dated: 11/28/, 2016         ALDRIDGE PITE, LLP


By _____
         Todd S. Garan
         Attorneys for Creditor

Claim Treatment Stipulation.v.1                                    Page - 6 -

1 | incorporate the terms and provisions of this Stipulation into Debtor's Chapter 11 Plan by reference

2 | (including any amended or modified Chapter 11 Plan). In the event of a conflict between a

3 | provision of Debtor's Plan and the Stipulation, the Stipulation shall control. Further, the terms and

4 | provisions of this Stipulation may not be modified, altered, or changed by any Chapter 11 Plan,

5 | including any subsequently filed amended or modified Chapter 11 Plan of Reorganization and/or

6 | confirmation order on the foregoing without the express written consent of the Creditor.

7 | 14. In the event the Debtor's case is dismissed or converted to any other chapter under

8 | Title 11 of the United States Bankruptcy Code, Creditor shall retain its lien in the full, unmodified

9 | amount due under the Loan, Debtor will no longer be allowed to cure the delinquent contractual

10 | arrears as set forth herein, and the Automatic Stay shall be terminated without further notice, order

11 | or proceeding of the Court.

12 | 15. In exchange for the forgoing, Creditor shall provide a ballot voting in favor of the

13 | Debtor's Chapter 11 Plan of Reorganization for the Secured Claim.

14 |

15 | Dated: 11/23, 2016          JEFFREY S. SHINBROT, APLC

16 |

17 | By: _____

18 |                                  Jeffrey S. Shinbrot
                                    Attorney for Debtor

19 | Dated: _____, 2016     ALDRIDGE PITE, LLP

20 |

21 | By: _____

22 |                                  Todd S. Garan
                                    Attorneys for Creditor

23 |

24 |

25 |

26 |

27 |

28 |

Claim Treatment Stipulation.v.1                                    Page - 6 -

# EXHIBIT A

21

# INITIAL INTEREST<sup>SM</sup> NOTE

DECEMBER 22, 2006          RIVERSIDE                    CALIFORNIA
        [Date]                      [City]                              [State]

849 LINCOLN AVENUE, PASADENA, CA  91103

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ ***1,000,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **WELLS FARGO BANK, N.A.**

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of          6.375 %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

**(A) Time and Place of Payments**

I will make a payment every month on the first day of the month beginning on **FEBRUARY 01, 2007**          . Before the first fully amortizing principal and interest payment due date, my monthly payments will be only for the interest due on the unpaid principal of this Note. The due date of my first payment including fully amortizing principal and interest is the first day of **FEBRUARY 01, 2022**          . I will make payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on **JANUARY 01, 2037**          , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **WELLS FARGO HOME MORTGAGE, P.O. BOX 11701, NEWARK, NJ 071014701**                    or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. $ *******5,312.50 until the due date of the first fully amortizing principal and interest payment. Beginning with the first fully amortizing principal and interest payment, my payment will be in the amount of U.S. $ **********8,642.50

The Note Holder will notify me prior to the date of any change in the amount of my monthly payment in accordance with Section 7 of this Note. The Note Holder will provide the title and telephone number of a person who will answer any questions I may have regarding the notice.

MULTISTATE INITIAL INTEREST FIXED RATE NOTE - Single Family - Freddie Mac UNIFORM INSTRUMENT
VMP®-189N (0406)                    Form 5206 6/04

Page 1 of 4          Initials:

22                                        **EXHIBIT A**

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to the changes. If I make a partial Prepayment during the period ending with the due date of my last interest only monthly payment, the partial Prepayment will reduce the amount of my monthly payment. If I make a partial Prepayment after the due date of my last interest only payment, the amount of my monthly payment will not change unless the Note Holder agrees in writing to that change.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of **15** calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **5.000 %** of the overdue payment of interest during the period when my payment is interest only, and of principal and interest after that. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

Form 620 5/04

Initials _____

**EXHIBIT A**

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

VMP-189N (0406)

Page 3 of 4

Form 5206 5/04
Initials:

24

**EXHIBIT A**

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)                    _____ (Seal)
RONALD LEON                        -Borrower         MARIA CLAUDIA LEON                  -Borrower

_____ (Seal)                    _____ (Seal)
                                   -Borrower                                            -Borrower

_____ (Seal)                    _____ (Seal)
                                   -Borrower                                            -Borrower

**WITHOUT RECOURSE
PAY TO THE ORDER OF**
                                   _____ (Seal)    _____ (Seal)
**WELLS FARGO BANK, N.A.**          -Borrower                                            -Borrower
**BY** *Joan M. Mills*
     **Joan M. Mills, Vice President**

                                                                                *[Sign Original Only]*

 -189N (0406)                          Page 4 of 4                          Form 5206 5/04

25                                        **EXHIBIT A**

# EXHIBIT B

26

Recording Requested By:
WELLS FARGO BANK, N.A.

12/29/06



**20062897287**

Return To:
WFHM FINAL DOCS X9999-01M

1000 BLUE GENTIAN ROAD
EAGAN, MN 55121

Prepared By:
WELLS FARGO BANK, N.A.

1595 SPRUCE ST,, RIVERSIDE, CA
925060000

————————————————[Space Above This Line For Recording Data]————————————————

# DEED OF TRUST

## DEFINITIONS
Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are
also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated DECEMBER 22, 2006
together with all Riders to this document.
**(B) "Borrower"** is RONALD LEON AND MARIA CLAUDIA LEON, HUSBAND AND WIFE

Borrower's address is 849 LINCOLN AVENUE
PASADENA           CA 91103           . Borrower is the trustor under this Security Instrument.
**(C) "Lender"** is WELLS FARGO BANK, N.A.

Lender is a NATIONAL ASSOCIATION
organized and existing under the laws of THE UNITED STATES

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3005 1/01

VMP® -6(CA) (0.07).01

Page 1 of 15          Initials:

VMP Mortgage Solutions, Inc.



**EXHIBIT B**

Lender's address is P.O. BOX 11701, NEWARK, NJ 071014701

Lender is the beneficiary under this Security Instrument.
(D) "Trustee" is FIDELITY NATIONAL TITLE INS CO
17911 VON KARMAN, SUITE 200, IRVINE, CA 92614
(E) "Note" means the promissory note signed by Borrower and dated
The Note states that Borrower owes Lender ONE MILLION AND 00/100

Dollars

(U.S. $ **1,000,000.00        ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than JANUARY 01, 2037
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☒ Other(s) [specify] |

EXHIBIT "A"

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(P) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to
time, or any additional or successor legislation or regulation that governs the same subject matter. As used
in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

VMP® -6(CA) (0207) 01                          Page 2 of 15          Initials:                Form 3005  1/01

EXHIBIT B

4

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the
COUNTY                                             of LOS ANGELES                                        :

[Type of Recording Jurisdiction]                            [Name of Recording Jurisdiction]

**LEGAL DESCRIPTION ATTACHED HERETO AND MADE PART HEREOF:**

EXHIBIT "A"

TAX STATEMENTS SHOULD BE SENT TO:  WELLS FARGO HOME MORTGAGE, P.O. BOX 11701, NEWARK, NJ  071014701

Parcel ID Number: 5726-004-021                        which currently has the address of
849 LINCOLN AVENUE                                                            [Street]
PASADENA                            [City], California  91103            [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S.

VMP®-6(CA) (0707).01                    Page 3 of 15                    Initials: ___    Form 3005  1/01

29

**EXHIBIT B**

5

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

**EXHIBIT B**

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

 -6(CA) (0207).01

Page 6 of 15



Form 3005   1/01

**EXHIBIT B**

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

-6(CA)    Page 6 of 15    Form 3005  1/01

**EXHIBIT B**

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable


-6(CA)                                           Page 7 of 16                                   Form 3005  1/01

**EXHIBIT B**

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

VMP -6(CA) (0207).01                          Page 8 of 15                          Form 3005  1/01

Initials _____

34

**EXHIBIT B**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

VMP®-6(CA) (0207).01                    Page 9 of 15                    Form 3005  1/01

**EXHIBIT B**

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.



-6(CA) (0207).01                                Page 10 of 15                    Initials _____    Form 3005  1/01

**EXHIBIT B**

12

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

 -6(CA) (0207).01                     Page 11 of 15          Initials:           Form 3005  1/01

**EXHIBIT B**

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.





-6(CA) (0207).01    Page 12 of 15    Form 3005  1/01

EXHIBIT B

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

**23. Reconveyance.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

**24. Substitute Trustee.** Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

**25. Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.



VMP -6(CA) (0207).01                Page 13 of 16                Initials: [signature]        Form 3005   1/01

**EXHIBIT B**

C5
2
8
6
7
2
8
7

15

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____    _____ (Seal)
                              RONALD LEON                  -Borrower

_____    _____ (Seal)
                              MARIA CLAUDIA LEON           -Borrower

_____ (Seal)        _____ (Seal)
              -Borrower                              -Borrower

_____ (Seal)        _____ (Seal)
              Borrower                               -Borrower

_____ (Seal)        _____ (Seal)
              -Borrower                              -Borrower

**EXHIBIT B**

40

16

State of California
County of ~~RIVERSIDE~~  *LOS ANGELES*           } ss.

On *DECEMBER 22, 2006* before me, *JANET F. CERSWELL, NOTARY PUBLIC*

personally appeared

RONALD LEON AND MARIA CLAUDIA LEON

, personally known to me
(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity
upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____ (Seal)

JANET F. CERSWELL
Comm. # 1460896
NOTARY PUBLIC-CALIFORNIA
Los Angeles County
My Comm. Expires Jan. 6, 2008

VMP -6(CA) (02...              Page 13 of 16              Form 3005   1/01

41                                    **EXHIBIT B**

17

## EXHIBIT "A"

Lot(s) 3, 4, 29 and 30, the Northerly half of Lots 2 and 31, and the Southerly 15 feet of Lots 5 and 28, of Lincoln Avenue Terrace Tract, in the City of Pasadena, County of Los Angeles, State of California, as per map recorded in Book 5 Page(s) 24 of Maps, in the office of the County Recorder of said County.

Excepting therefrom that portion of land described as "Parcels 44135-1 and 44135-2" in that certain "Final Order of Condemnation" had in Case No. 965695 dated December 4, 1970, and recorded December 18, 1970 as Instrument No. 2066 of Official Records, Records of said Los Angeles County.

**EXHIBIT B**

# EXHIBIT C

43

Recording Requested By:
FIRST AMERICAN LOANSTAR TRUSTEE
SERVICES

When Recorded Mail To:
FIRST AMERICAN LOANSTAR TRUSTEE
SERVICES
P.O. BOX 961253
FT WORTH, TX 76161-0253

09/03/2009

*20091354036*

APN:
TS No. :

Title Order No. :

Space above this line for Recorder's use only

## ASSIGNMENT OF DEED OF TRUST

**For Value Received, the undersigned corporation hereby grants, assigns, and transfers to:**

**HSBC BANK USA, NATIONAL ASSOCIATION AS TRUSTEE FOR WELLS
FARGO ASSET SECURITIES CORPORATION, MORTGAGE PASS-THROUGH
CERTIFICATES, SERIES 2007-2.,**

all beneficial interest under that certain Deed of Trust dated: **12/22/2006** executed by

**RONALD LEON, MARIA CLAUDIA LEON**

Trustor(s), to **FIDELITY NATIONAL TITLE INS CO**, as Trustee, and recorded on **12/29/2006** as
Instrument No. **20062897287**, in Book , Page  in the office of the County Recorder of **LOS ANGELES**
County, **CALIFORNIA** together with the Promissory Note secured by said Deed of Trust and also all
rights accrued or to accrue under said Deed of Trust.

Dated : 8/25/09

WELLS FARGO BANK, N.A., BY FIRST
AMERICAN LOANSTAR TRUSTEE SERVICES,
LLC, ITS ATTORNEY IN FACT, AS
BENEFICIARY

By: Chet Sconyers, Certifying Officer

State of    **TEXAS**

County of    **TARRANT**

Before me _____ **R. Martin** _____ , on this day personally appeared,

Chet Sconyers _____ , known to me to be the person whose name is

subscribed to the foregoing instrument and acknowledged to me that this person executed the same for
the purposes and consideration therein expressed.

Given under my hand and seal of office this 25 day of Aug , A.D. 2009.

R. Martin    (Notary Seal)

R. MARTIN
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
02-17-2012

44

**EXHIBIT D**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

4375 Jutland Drive/Suite 200/P.O. BOX 17933/San Diego, CA 92177

A true and correct copy of the foregoing document entitled (*specify*): __Stipulation Re: Treatment of Creditor's Claim__
__Under Debtor's Chapter 11 Plan of Reorganization_____
_____
_____
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) __12/02/2016__, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

   United States Trustee, ustpregion16.la.ecf@usdoj.gov

   United States Trustee (represented by): Melanie Scott, melanie.scott@usdoj.gov

   Attorney for Debtor: Jeffrey S Shinbrot, jeffrey@shinbrotfirm.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) __12/02/2016__, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Honorable Judge Julia W. Brand             DEBTOR
Suite 1382, Courtroom 1375                 Robert Leon
255 E. Temple Street                       849 Lincoln Avenue
Los Angeles, CA 90012                      Pasadena, CA 91103

☑ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/02/2016 | Esteban Garcia | /s/ Esteban Garcia |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

## VIA FIRST CLASS U.S. MAIL:

<u>ATTORNEY FOR DEBTOR</u>

Jeffrey S. Shinbrot
Jeffrey S. Shinbrot, APLC
8200 Wilshire Blvd., Suite 400
Beverly Hills, CA 90211


<u>OTHER PARTIES IN INTEREST</u>

Hahn Fife & Company
790 E Colorado Blvd., 9th Floor
Pasadena, CA 91101

**EXHIBIT 2**

# Agreement To Rent Or Lease

This Agreement is made and entered into between _____, hereinafter
"**Owner**" and (names of all Residents and names and ages of children to reside on the premises):

**Resident** _Hector Sobalvarro_ (Age) _43_    **Resident** _____ (Age)_____

**Resident** _____ (Age)_____    **Resident** _____ (Age)_____

**Resident** _____ (Age)_____    **Resident** _____ (Age)_____

Hereinafter "**Resident**." The word Resident as used herein shall include the singular as well as the plural. Subject to the terms and
conditions below, Owner rents to Resident, and Resident rents from Owner, for residential purposes only, the premises known as:

_849 Lincoln Ave, Pasadena, Calif._ Unit # _____ (if applicable)

in the City of _____Pasadena,_____, California _91103_

**Owner and Resident mutually agree as follows:**
**1. TERM.** The term of the rental shall begin on _Jan 1, 2015_, and shall continue as follows subject to the payment
of rent for one month and the security deposit:  (check one)

☐  For a period of _12_ months and _0_ days thereafter expiring on _1 / 1 / 16_ (**the expiration date**).
Renewal of the term shall be as described in Paragraph 22 of this Agreement (**A Fixed Term Lease**).

☐  On a periodic tenancy basis, terminable by either party by the giving of a written notice pursuant to Paragraph 22 of this
Agreement (**A Periodic Tenancy**).

**2. RENT.** Resident shall pay to Owner the Monthly rent of $ _1,000_, in advance on or before the _5th_ day of each
month without deduction or offset. On signing this Agreement Resident shall pay one full month's rent in the form of a cashier's check
or money order only. The rent for the partial month's prior shall be prorated on the basis of a 30-day month and shall be paid on or
before the next rental due date.

**3. SECURITY DEPOSIT.** On signing this Agreement, Resident shall pay to Owner the sum of $ _500_ as a deposit to secure
Resident's performance of the covenants contained herein. No part of this deposit is to be considered as an advance payment of rent,
including last months' rent, nor is it to be used for refunded prior to the leased premises being permanently and totally vacated by all
Residents. After Resident has vacated the premises, Owner shall furnish Resident with an itemized written statement of the basis for,
and the amount of, any of the security deposit retained by Owner. Owner may withhold that portion of Resident's security deposit
necessary (a) to remedy any default by Resident in the payment of rent or any other provision of this Agreement, (b) to repair damages
to the premises, to include repainting, but exclusive of ordinary wear and tear, and (c) to remove trash and clean the premises to meet
Owner's re-rental standards, as provided by law. The unused portion of this deposit shall be returned to Resident without interest,
according to law.

**4. UTILITIES.** Resident shall pay for all utilities, services and charges, except _Included_.

**5. OCCUPANCY.** Resident agrees that the premises are to be used as a private residence for Resident listed herein, for a total of
_1_ adults and _0_ child/children and by no other persons and for no other reason. Guest may not stay more than 14
consecutive days in any six month period without the prior written consent of Owner.

**6. LATE CHARGE / RETURNED CHECKS.** Resident acknowledges that Owner will incur certain administrative cost in connection
with late Rental payment, and that the amount of such administrative cost would be difficult or impracticable to ascertain. If Resident
fails to pay the rent in full by the end of the _10_ **day after it is due**, Resident shall pay a late charge of $ _100_ as additional
rent. Owner does not waive the right to insist on payment of rent in full on the day it is due. In the event Resident's check is dishonored
by the bank, Resident shall pay a returned check charge of $25 as additional rent. A late charge will be imposed if the returned check
causes the rent to be late. Owner may require future payments to be in a form other than personal check in the event of a returned
check.

**7. ACCEPTANCE OF PREMISES.** Resident has inspected the premises, furnishing and equipment, and has found them to be
satisfactory. All plumbing, heating and electrical systems are operative and deemed satisfactory.

*Page 1 of 4*

**8. POSSESSION OF PREMISES.** In the event Owner is unable to deliver possession of the premises to Resident for any reason not within Owner's control, including, but not limited to failure of prior occupants to vacate as agreed or required by law, Owner shall not be liable to Resident except for the return of all sums previously paid to Owner in the event Resident chooses to terminate this Rental Agreement.

**9. PETS, WATER-FILLED FURNITURE/ANTENNAS AND/OR SATELLITE DISHES.** No animal, pet, antenna/satellite dish or water-filled furniture shall be kept on or about the premises without the prior written consent of the Owner.

**10. SECURITY.** Resident acknowledges that Owner has made no representation that the property is a "secure" complex, and that Resident is safe from theft, injury or damage. Gates, fences and locks are provided primarily for the protection of Owner's property and are not a warranty of protection nor are they specifically provided for the protection of Resident or guest's person or property. Resident shall take appropriate measures to protect their own property, and report to the Police any suspicious activities, persons or events occurring on or about the general premises.

**11. QUIET ENJOYMENT / USE.** All residents shall be entitled to quiet enjoyment of the premises. Resident shall not use the premises in such a way as to violate any law or ordinance, commit waste or nuisance, annoy, disturb, inconvenience, or interfere with the quiet enjoyment of any other resident, including but not limited to having loud or late parties or playing loud music. Resident shall ensure that their guests also comply with this provision. Violations constitute a breach of the Agreement, and Owner may take legal action to terminate the Agreement and remove Resident.

**12. JOINT AND SEVERAL LIABILITY (CO-RESIDENT).** If more than one Resident enters into this Agreement ("roommates'), the obligations are joint and several; each such Resident is individually, as well as jointly, liable for full performance of all agreed terms and payment of all sums required hereunder as long as any one of the Residents remain in possession of the premises. Any breach or abandonment by any one or more of the Residents shall not terminate the Agreement nor shall it relieve the remaining Resident from fulfilling the terms of this Agreement. Should one or more of the Residents terminate their residency apart and separately from other Resident, no right to have another person substituted in their stead shall exist.

**13. CARE AND MAINTENANCE.** Resident agrees to keep the premises clean, in good order and repair, and free of trash, mold, mildew and unsightly material and to immediately notify Owner, in writing, of any defects or dangerous conditions in or about the premises, particularly any water penetration. Resident shall reimburse Owner for the cost to repair damage by Resident through misuse or neglect including but not limited to plumbing stoppages. Except as provided by law, no repairs, decorating or alterations shall be done by the Resident without the Owner's prior written consent, which may require that only a licensed and bonded contractor perform such work.

**14. RIGHT OF ENTRY.** Owner or Owner's agents shall have right to enter the premises for purposes of performing inspections; to make necessary or agreed repairs, alterations or improvements; supplying agreed services; to exhibit the property to prospective residents; when the Resident has abandoned or surrendered the premises; in case of emergency, and pursuant to court order or state law. Except in cases of emergency, Owner shall give Resident reasonable notice of intent to enter. Resident may be present, however such entry shall not be conditioned upon such presence, and Resident agrees to indemnify and hold Owner free and harmless for such entry.

**15. VEHICLES AND PARKING.** Owner reserves the right to control parking and to tow away, at Resident's expense, any vehicle causing an unsafe/hazardous condition or parked in unauthorized spaces. No automobile or other motor-driven vehicle or cycle may be brought onto the premises unless such vehicle complies with governmental noise limitations, is free of any leaking fluids, insured for public liability/ property damage, operable, and currently register.

**16. SUBLEASING / ASSIGNMENT.** Resident shall not sublease any part of the premises or assign this Agreement without the prior written consent of Owner. Any such action, without prior written consent, is void.

**17. PEST CONTROL.** Upon demand by Owner, Residents shall temporarily vacate the premises for a reasonable period of time to allow pest or vermin control work to be done. Resident shall comply with all instructions, forthwith, from pest controller, fumigator and/or exterminator regarding the preparation of the premises for the work, including the proper bagging and storage of food, perishables and medicine.

**18. LIABILITY / DAMAGE RESPONSIBILITY.** Resident agrees to hold Owner harmless from all claims of loss or damage to property, and of injury or death to persons caused by the intentional acts or negligence of the Resident, his guest or invitees, or occurring on the premises rented for Resident's exclusive use. **Resident expressly absolves Owner from any and all liability for any loss or damage to Resident's property or effects arising out of water leakage or breaking pipes, or theft, or other cause beyond the reasonable control of Owner.** This includes damage to Resident's or guest's vehicles while parked on the property. In the event the premises are damaged by fire or other casualty, Owner shall have the option either to (1) repair such damage, this Agreement

*Page 2 of 4*

continuing in full force and effect, or (2) give notice to Resident terminating this Agreement. Owner shall not be required to repair or replace any property brought onto the premises by Resident. Resident agrees to accept financial responsibility for any damage to the premises from fire, water or casualty caused by Resident's negligence. **Resident is encouraged to carry a standard renter's policy** or as an alternative, warrants that they will be financially responsible for losses not covered by Owner's fire and extended coverage insurance policy. In no event shall Resident be entitled to any compensation or damage due to any extra expense, annoyance or inconvenience for loss of use due to a casualty beyond the control of the Owner.

**19. TERMINATION: CLEANING / REPAIRS.** Upon termination of the tenancy, Resident shall leave the premises in a clean and orderly condition, free of trash and personal property. If this is not done, Resident expressly agrees that Owner shall perform all cleaning services, including carpet cleaning and/or repair, which may be required in Owner's discretion to restore the premises to **Owner's standards for new occupancy.** The costs incurred by Owner for such services shall be deducted from Resident's security deposit. If Owner is required to perform a pre-move out inspection, or any repair or renovation as a result of Resident's decoration, modification or damage, regardless of the cause, the cost of such inspection repair and/or renovation shall be deducted from Resident's security deposit. In the event the deposit is not sufficient to pay all the lawful expenses and charges at the termination of this residency, Residents shall immediately, upon written notice, pay Owner any additional sums necessary to pay all such charges in full.

**20. RULES AND REGULATIONS.** Resident acknowledges receipt of, and has read a copy of the Apartment Rules and Regulations, which are hereby incorporated into this Agreement by this reference. Owner may terminate this Agreement, as provided by law, if any of these Rules and Regulations are violated. Such Rules and Regulations may be amended from time to time upon giving notice to Resident. If the property is located within a common interest development, Resident agrees to comply with and abide by any Declaration of Covenants, Conditions and Restrictions (CC & R's) and Association Rules and Regulations. A copy of these documents (if applicable) are made a part of this agreement. Residents shall comply with any valid order of the Association and shall pay to Owner any charge assessed by reason of Resident's breach.

**21. SMOKE DETECTION DEVICE.** The premises are equipped with a smoke detection device(s), and: (a) Resident acknowledges the smoke detector(s) was tested and its operation explained by management, in the presence of Resident, at time of initial occupancy, and the detector(s) in the unit was working properly at the time, (b) Resident shall test the smoke detector at least once a week to determine if the smoke detector(s) is operating properly, and immediately inform the Owner, in writing, of any malfunction.

**22. TERMINATION / HOLDING OVER.** If this Agreement is a periodic tenancy, either party may terminate the tenancy by the service of at least 30 days written notice, if the tenancy is less than one year, or by the service by either party of at least 60 days written notice if the tenancy is one year or longer at the time of service of the notice. If this Agreement is a Fixed Term Lease, it shall automatically convert to a periodic tenancy upon the expiration date of the Fixed Term Lease. In the absence of any written communication between the parties, the residency shall continue on a periodic tenancy basis, including any changes, i.e. rent adjustments, having been made by Owner with proper written notice.

**23. DEFAULT.** In the event of a default by Resident, Owner may elect to (a) continue the lease in effect and enforce all his rights and remedies hereunder, including the right to recover the rent as it becomes due, or (b) at any time, terminate all of Resident's rights hereunder, and recover from Resident all damages he may incur by reason of the breach of the lease, including the cost of recovering the premises, and including the worth at the time of such termination, or at the time of an award if suit be instituted to enforce this provision, of the amount by which the unpaid rent for the balance of the term exceeds the amount of such rental loss which the Resident proves could be reasonable avoided, and any other damages as provided by law. Pursuant to CC1785.26 Resident is hereby notified that a negative credit report reflecting on Resident's credit record may be submitted to a credit reporting agency if Resident fails to fulfill the terms of this Rental Agreement. All remedies provided herein are cumulative.

**24. ARBITRATION OF DISPUTES. ANY DISPUTE BETWEEN THE PARTIES ARISING FROM OR RELATING TO A CLAIM FOR PERSONAL INJURY, WHICH IS DIRECTLY OR INDIRECTLY RELATED TO, OR ARISING FROM A CONDITION OF THE LEASED PREMISES OR THE COMMON AREAS, OR ANY EVENT THEREON, SHALL BE RESOLVED SOLELY BY ARBITRATION CONDUCTED BY THE AMERICAN ARBITRATION ASSOCIATION.** Any such arbitration shall be held and conducted in the county in which the premises are located before three arbitrators, who shall be selected as follows: The claimant and respondent shall each select one arbitrator. The two selected arbitrators will then select a third arbitrator, and the three arbitrators shall constitute the panel. The provisions of the American Arbitration Association rules shall apply and govern such arbitration, subject, however, to the following: (a) Any demand for arbitration shall be made in writing and must be made within 180 days after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date that institution of legal or equitable proceedings based on such a matter would have been barred by the applicable statute of limitations. (b) The arbitrators' jurisdiction extends to all punitive damages claims and call actions. (c) Each party shall bear their own respective fees and cost relative to the arbitration process, and attorneys' fees, if awarded shall not exceed $500.00. (d) All administrative fees and costs, including but not limited to the arbitrators' fees relative to the arbitration process must be advanced prior to the selection of the arbitration panel and shall be borne equally by all parties. (e) The decision of the arbitrators shall be final, and judgment may be entered on it in accordance with applicable law.

This provision shall not affect nor apply to any circumstance or event in which the Resident is in breach or default of any term of the tenancy agreement, including but not limited to those circumstances which would give rise to a cause of action for Unlawful Detainer under the laws of the State of California. Said actions for unlawful detainer are specifically excluded from this provision.

**25. ATTORNEYS' FEES / WAIVER OF JURY TRIAL.** If any legal action or proceeding is brought by either party to enforce any part of this agreement, the prevailing party shall recover, in addition to all other relief, reasonable costs and attorneys' fees, whether or not the action proceeds to judgment. If a legal action or proceeding is brought to enforce any of the obligations of this agreement, the parties agree that the reasonable attorney's fees to be awarded shall not exceed $500 to the prevailing party in any action or proceeding. In no instance shall this provision limit the court from awarding additional sanctions pursuant to the Code of Civil Procedure or the California Rules of Court. **RECOGNIZING THAT JURY TRIALS ARE BOTH TIME CONSUMING AND EXPENSIVE, OWNER AND RESIDENT HEREBY WAIVE THEIR RIGHT TO A TRIAL BY JURY ON ANY MATTER ARISING OUT OF THIS AGREEMENT, OR THE USE, OR THE OCCUPANCY OF THE PREMISES HEREIN.**

**26.** The California Department of Justice, sheriff's departments, police departments serving jurisdictions of 200,000 or more and many other local law enforcement authorities maintain for public access a data base of the locations of persons required to register pursuant to paragraph (1) of subdivision (a) of Section 290.4 of the Penal Code. The data base is updated on a quarterly basis and a source of information about the presence of these individuals in any neighborhood. The Department of Justice also maintains a Sex Offender Identification Line through which inquiries about individuals may be made. This is a "900" telephone service. Callers must have specific information about individuals they are checking. Information regarding neighborhoods is not available through the "900" telephone service.

**27. GENERAL.** Each and every term, covenant and agreement herein contained shall be deemed a condition hereof. No oral agreements have been entered into, and this Agreement shall not be modified unless such modification is reduced to writing. The terms of a periodic tenancy may be modified by the Owner by the service of a 30 day written notice. Waiver of any breach of any term or condition of this Agreement shall not constitute a waiver of subsequent breaches. The invalidity or partial invalidity of any provision of this Agreement shall not render the remainder of the Agreement invalid or unenforceable. Time is of the essence in this Agreement and each provision herein contained. Words used in the singular shall include the plural, and vice versa, where the context requires. The breach of any of the covenants or terms of this Agreement shall be deemed to be a material and total breach of this entire Agreement and shall give rise to all rights of termination. This Agreement shall be binding upon and shall inure to the benefit of the heirs, administrators, successors and assigns of all the parties hereto, and all of the parties hereto shall be jointly and severally liable hereunder. Any and all monetary obligations pursuant to this contract, including but not limited to the reasonable cost of conducting a pre-move out inspection, shall be deemed rent or additional rent.

**By signing this agreement the parties hereto indicate that they have read and understand this entire agreement and agree to all of the terms, covenants and conditions stated herein. Resident acknowledges receipt of a copy of this agreement with all addenda.**

| 1/1/15 | OBAWANNO | _____ | _____ |
|--------|----------|---------|---------|
| Date | Resident | Date | Resident |

| _____ | _____ | _____ | _____ |
|---------|---------|---------|---------|
| Date | Resident | Date | Resident |

| 1/1/15 | _____ |
|--------|---------|
| Date | Owner/Agent for Owner |

Rev. 01/01/03

**EXHIBIT 3**

This Agreement is made and entered into between _____ ; hereinafter
"Owner" and (names of all Residents and names and ages of children to reside on the premises):

Resident __ERIC TUPKER__ (Age) __54__   Resident _____ (Age)_____

Resident _____ (Age)_____   Resident _____ (Age)_____

Resident _____ (Age)_____   Resident _____ (Age)_____

Hereinafter "Resident." The word Resident as used herein shall include the singular as well as the plural. Subject to the terms and
conditions below, Owner rents to Resident, and Resident rents from Owner, for residential purposes only, the premises known as:

__849 Lincoln Ave, Pasadena, Calif.__ Unit # __Guest Apt__ (if applicable)

in the City of __Pasadena,__ _____ , California __91103__

Owner and Resident mutually agree as follows: __Jan 1, 2017__
1. TERM. The term of the rental shall begin on _____ and shall continue as follows subject to the payment
of rent for one month and the security deposit: (check one)

☐ For a period of __12__ months and __0__ days thereafter expiring on __1 / 1 / 2018__ (the expiration date).
Renewal of the term shall be as described in Paragraph 22 of this Agreement (A Fixed Term Lease).

☐ On a periodic tenancy basis, terminable by either party by the giving of a written notice pursuant to Paragraph 22 of this
Agreement (A Periodic Tenancy).

2. RENT. Resident shall pay to Owner the Monthly rent of $ __835.00__ in advance on or before the __5th__ day of each
month without deduction or offset. On signing this Agreement Resident shall pay one full month's rent in the form of a cashier's check
or money order only. The rent for the partial month's prior shall be prorated on the basis of a 30-day month and shall be paid on or
before the next rental due date.

3. SECURITY DEPOSIT. On signing this Agreement, Resident shall pay to Owner the sum of $ __500.00__ as a deposit to secure
Resident's performance of the covenants contained herein. No part of this deposit is to be considered as an advance payment of rent,
including last months' rent, nor is it to be used for refunded prior to the leased premises being permanently and totally vacated by all
Residents. After Resident has vacated the premises, Owner shall furnish Resident with an itemized written statement of the basis for,
and the amount of, any of the security deposit retained by Owner. Owner may withhold that portion of Resident's security deposit
necessary (a) to remedy any default by Resident in the payment of rent or any other provision of this Agreement, (b) to repair damages
to the premises, to include repainting, but exclusive of ordinary wear and tear, and (c) to remove trash and clean the premises to meet
Owner's re-rental standards, as provided by law. The unused portion of this deposit shall be returned to Resident without interest,
according to law.

4. UTILITIES. Resident shall pay for all utilities, services and charges, except __included__

5. OCCUPANCY. Resident agrees that the premises are to be used as a private residence for Resident listed herein, for a total of
__1__ adults and __0__ child/children and by no other persons and for no other reason. Guest may not stay more than 14
consecutive days in any six month period without the prior written consent of Owner.

6. LATE CHARGE / RETURNED CHECKS. Resident acknowledges that Owner will incur certain administrative cost in connection
with late Rental payment, and that the amount of such administrative cost would be difficult or impracticable to ascertain. If Resident
fails to pay the rent in full by the end of the __10__ day after it is due, Resident shall pay a late charge of $ __100.00__ as additional
rent. Owner does not waive the right to insist on payment of rent in full on the day it is due. In the event Resident's check is dishonored
by the bank. Resident shall pay a returned check charge of $25 as additional rent. A late charge will be imposed if the returned check
causes the rent to be late. Owner may require future payments to be in a form other than personal check in the event of a returned
check.

7. ACCEPTANCE OF PREMISES. Resident has inspected the premises, furnishing and equipment, and has found them to be
satisfactory. All plumbing, heating and electrical systems are operative and deemed satisfactory.

Page 1 of 4

51

8. POSSESSION OF PREMISES. In the event Owner is unable to deliver possession of the premises to Resident for any reason not within Owner's control, including, but not limited to failure of prior occupants to vacate as agreed or required by law, Owner shall not be liable to Resident except for the return of all sums previously paid to Owner in the event Resident chooses to terminate this Rental Agreement.

9. PETS, WATER-FILLED FURNITURE/ANTENNAS AND/OR SATELLITE DISHES. No animal, pet, antenna/satellite dish or water-filled furniture shall be kept on or about the premises without the prior written consent of the Owner.

10. SECURITY. Resident acknowledges that Owner has made no representation that the property is a "secure" complex, and that Resident is safe from theft, injury or damage. Gates, fences and locks are provided primarily for the protection of Owner's property and are not a warranty of protection nor are they specifically provided for the protection of Resident or guest's person or property. Resident shall take appropriate measures to protect their own property, and report to the Police any suspicious activities, persons or events occurring on or about the general premises.

11. QUIET ENJOYMENT / USE. All residents shall be entitled to quiet enjoyment of the premises. Resident shall not use the premises in such a way as to violate any law or ordinance, commit waste or nuisance, annoy, disturb, inconvenience, or interfere with the quiet enjoyment of any other resident, including but not limited to having loud or late parties or playing loud music. Resident shall ensure that their guests also comply with this provision. Violations constitute a breach of the Agreement, and Owner may take legal action to terminate the Agreement and remove Resident.

12. JOINT AND SEVERAL LIABILITY (CO-RESIDENT). If more than one Resident enters into this Agreement ("roommates"), the obligations are joint and several; each such Resident is individually, as well as jointly, liable for full performance of all agreed terms and payment of all sums required hereunder as long as any one of the Residents remain in possession of the premises. Any breach or abandonment by any one or more of the Residents shall not terminate the Agreement nor shall it relieve the remaining Resident from fulfilling the terms of this Agreement. Should one or more of the Residents terminate their residency apart and separately from other Resident, no right to have another person substituted in their stead shall exist.

13. CARE AND MAINTENANCE. Resident agrees to keep the premises clean, in good order and repair, and free of trash, mold, mildew and unsightly material and to immediately notify Owner, in writing, of any defects or dangerous conditions in or about the premises, particularly any water penetration. Resident shall reimburse Owner for the cost to repair damage by Resident through misuse or neglect including but not limited to plumbing stoppages. Except as provided by law, no repairs, decorating or alterations shall be done by the Resident without the Owner's prior written consent, which may require that only a licensed and bonded contractor perform such work.

14. RIGHT OF ENTRY. Owner or Owner's agents shall have right to enter the premises for purposes of performing inspections; to make necessary or agreed repairs, alterations or improvements; supplying agreed services; to exhibit the property to prospective residents; when the Resident has abandoned or surrendered the premises; in case of emergency, and pursuant to court order or state law. Except in cases of emergency, Owner shall give Resident reasonable notice of intent to enter. Resident may be present, however such entry shall not be conditioned upon such presence, and Resident agrees to indemnify and hold Owner free and harmless for such entry.

15. VEHICLES AND PARKING. Owner reserves the right to control parking and to tow away, at Resident's expense, any vehicle causing an unsafe/hazardous condition or parked in unauthorized spaces. No automobile or other motor-driven vehicle or cycle may be brought onto the premises unless such vehicle complies with governmental noise limitations, is free of any leaking fluids, insured for public liability/ property damage, operable, and currently register.

16. SUBLEASING / ASSIGNMENT. Resident shall not sublease any part of the premises or assign this Agreement without the prior written consent of Owner. Any such action, without prior written consent, is void.

17. PEST CONTROL. Upon demand by Owner, Residents shall temporarily vacate the premises for a reasonable period of time to allow pest or vermin control work to be done, Resident shall comply with all instructions, forthwith, from pest controller, fumigator and/or exterminator regarding the preparation of the premises for the work, including the proper bagging and storage of food, perishables and medicine.

18. LIABILITY / DAMAGE RESPONSIBILITY. Resident agrees to hold Owner harmless from all claims of loss or damage to property, and of injury or death to persons caused by the intentional acts or negligence of the Resident, his guest or invitees, or occurring on the premises rented for Resident's exclusive use. Resident expressly absolves Owner from any and all liability for any loss or damage to Resident's property or effects arising out of water leakage or breaking pipes, or theft, or other cause beyond the reasonable control of Owner. This includes damage to Resident's or guest's vehicles while parked on the property. In the event the premises are damaged by fire or other casualty, Owner shall have the option either to (1) repair such damage, this Agreement

*Page 2 of 4*

continuing in full force and effect, or (2) give notice to Resident terminating this Agreement. Owner shall not be required to repair or replace any property brought onto the premises by Resident. Resident agrees to accept financial responsibility for any damage to the premises from fire, water or casualty caused by Resident's negligence. Resident is encouraged to carry a standard renter's policy or as an alternative, warrants that they will be financially responsible for losses not covered by Owner's fire and extended coverage insurance policy. In no event shall Resident be entitled to any compensation or damage due to any extra expense, annoyance or inconvenience for loss of use due to a casualty beyond the control of the Owner.

19. TERMINATION: CLEANING / REPAIRS. Upon termination of the tenancy, Resident shall leave the premises in a clean and orderly condition, free of trash and personal property. If this is not done, Resident expressly agrees that Owner shall perform all cleaning services, including carpet cleaning and/or repair, which may be required in Owner's discretion to restore the premises to Owner's standards for new occupancy. The costs incurred by Owner for such services shall be deducted from Resident's security deposit. If Owner is required to perform a pre-move out inspection, or any repair or renovation as a result of Resident's decoration, modification or damage, regardless of the cause, the cost of such inspection repair and/or renovation shall be deducted from Resident's security deposit. In the event the deposit is not sufficient to pay all the lawful expenses and charges at the termination of this residency, Residents shall immediately, upon written notice, pay Owner any additional sums necessary to pay all such charges in full.

20. RULES AND REGULATIONS. Resident acknowledges receipt of, and has read a copy of the Apartment Rules and Regulations, which are hereby incorporated into this Agreement by this reference. Owner may terminate this Agreement, as provided by law, if any of these Rules and Regulations are violated. Such Rules and Regulations may be amended from time to time upon giving notice to Resident. If the property is located within a common interest development, Resident agrees to comply with and abide by any Declaration of Covenants, Conditions and Restrictions (CC & R's) and Association Rules and Regulations. A copy of these documents (if applicable) are made a part of this agreement. Residents shall comply with any valid order of the Association and shall pay to Owner any charge assessed by reason of Resident's breach.

21. SMOKE DETECTION DEVICE. The premises are equipped with a smoke detection device(s), and: (a) Resident acknowledges the smoke detector(s) was tested and its operation explained by management, in the presence of Resident, at time of initial occupancy, and the detector(s) in the unit was working properly at the time, (b) Resident shall test the smoke detector at least once a week to determine if the smoke detector(s) is operating properly, and immediately inform the Owner, in writing, of any malfunction.

22. TERMINATION / HOLDING OVER. If this Agreement is a periodic tenancy, either party may terminate the tenancy by the service of at least 30 days written notice, if the tenancy is less than one year, or by the service by either party of at least 60 days written notice if the tenancy is one year or longer at the time of service of the notice. If this Agreement is a Fixed Term Lease, it shall automatically convert to a periodic tenancy upon the expiration date of the Fixed Term Lease. In the absence of any written communication between the parties, the residency shall continue on a periodic tenancy basis, including any changes, i.e. rent adjustments, having been made by Owner with proper written notice.

23. DEFAULT. In the event of a default by Resident, Owner may elect to (a) continue the lease in effect and enforce all his rights and remedies hereunder, including the right to recover the rent as it becomes due, or (b) at any time, terminate all of Resident's rights hereunder, and recover from Resident all damages he may incur by reason of the breach of the lease, including the cost of recovering the premises, and including the worth at the time of such termination, or at the time of an award if suit be instituted to enforce this provision, of the amount by which the unpaid rent for the balance of the term exceeds the amount of such rental loss which the Resident proves could be reasonable avoided, and any other damages as provided by law. Pursuant to CC1785.26 Resident is hereby notified that a negative credit report reflecting on Resident's credit record may be submitted to a credit reporting agency if Resident fails to fulfill the terms of this Rental Agreement. All remedies provided herein are cumulative.

24. ARBITRATION OF DISPUTES. ANY DISPUTE BETWEEN THE PARTIES ARISING FROM OR RELATING TO A CLAIM FOR PERSONAL INJURY, WHICH IS DIRECTLY OR INDIRECTLY RELATED TO, OR ARISING FROM A CONDITION OF THE LEASED PREMISES OR THE COMMON AREAS, OR ANY EVENT THEREON, SHALL BE RESOLVED SOLELY BY ARBITRATION CONDUCTED BY THE AMERICAN ARBITRATION ASSOCIATION. Any such arbitration shall be held and conducted in the county in which the premises are located before three arbitrators, who shall be selected as follows: The claimant and respondent shall each select one arbitrator. The two selected arbitrators will then select a third arbitrator, and the three arbitrators shall constitute the panel. The provisions of the American Arbitration Association rules shall apply and govern such arbitration, subject, however, to the following: (a) Any demand for arbitration shall be made in writing and must be made within 180 days after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date that institution of legal or equitable proceedings based on such a matter would have been barred by the applicable statute of limitations. (b) The arbitrators' jurisdiction extends to all punitive damages claims and call actions. (c) Each party shall bear their own respective fees and cost relative to the arbitration process, and attorneys' fees, if awarded shall not exceed $500.00. (d) All administrative fees and costs, including but not limited to the arbitrators' fees relative to the arbitration process must be advanced prior to the selection of the arbitration panel and shall be borne equally by all parties. (e) The decision of the arbitrators shall be final, and judgment may be entered on it in accordance with applicable law.

*Page 3 of 4*

This provision shall not affect nor apply to any circumstance or event in which the Resident is in breach or default of any term of the tenancy agreement, including but not limited to those circumstances which would give rise to a cause of action for Unlawful Detainer under the laws of the State of California. Said actions for unlawful detainer are specifically excluded from this provision.

25. ATTORNEYS' FEES / WAIVER OF JURY TRIAL. If any legal action or proceeding is brought by either party to enforce any part of this agreement, the prevailing party shall recover, in addition to all other relief, reasonable costs and attorneys' fees, whether or not the action proceeds to judgment. If a legal action or proceeding is brought to enforce any of the obligations of this agreement, the parties agree that the reasonable attorney's fees to be awarded shall not exceed $500 to the prevailing party in any action or proceeding. In no instance shall this provision limit the court from awarding additional sanctions pursuant to the Code of Civil Procedure or the California Rules of Court. RECOGNIZING THAT JURY TRIALS ARE BOTH TIME CONSUMING AND EXPENSIVE OWNER AND RESIDENT HEREBY WAIVE THEIR RIGHT TO A TRIAL BY JURY ON ANY MATTER ARISING OUT OF THIS AGREEMENT, OR THE USE, OR THE OCCUPANCY OF THE PREMISES HEREIN.

26. The California Department of Justice, sheriff's departments, police departments serving jurisdictions of 200,000 or more and many other local law enforcement authorities maintain for public access a data base of the locations of persons required to register pursuant to paragraph (1) of subdivision (a) of Section 290.4 of the Penal Code. The data base is updated on a quarterly basis and a source of information about the presence of these individuals in any neighborhood. The Department of Justice also maintains a Sex Offender Identification Line through which inquiries about individuals may be made. This is a "900" telephone service. Callers must have specific information about individuals they are checking. Information regarding neighborhoods is not available through the "900" telephone service.

27. GENERAL. Each and every term, covenant and agreement herein contained shall be deemed a condition hereof. No oral agreements have been entered into, and this Agreement shall not be modified unless such modification is reduced to writing. The terms of a periodic tenancy may be modified by the Owner by the service of a 30 day written notice. Waiver of any breach of any term or condition of this Agreement shall not constitute a waiver of subsequent breaches. The invalidity or partial invalidity of any provision of this Agreement shall not render the remainder of the Agreement invalid or unenforceable. Time is of the essence in this Agreement and each provision herein contained. Words used in the singular shall include the plural, and vice versa, where the context requires. The breach of any of the covenants or terms of this Agreement shall be deemed to be a material and total breach of this entire Agreement and shall give rise to all rights of termination. This Agreement shall be binding upon and shall inure to the benefit of the heirs, administrators, successors and assigns of all the parties hereto, and all of the parties hereto shall be jointly and severally liable hereunder. Any and all monetary obligations pursuant to this contract, including but not limited to the reasonable cost of conducting a pre-move out inspection, shall be deemed rent or additional rent.

By signing this agreement the parties hereto indicate that they have read and understand this entire agreement and agree to all of the terms, covenants and conditions stated herein. Resident acknowledges receipt of a copy of this agreement with all addenda.

|  |  |  | 12-6-2017 |  |
| --- | --- | --- | --- | --- |
| Date | Resident |  | Date | Resident |
| 12/6/2016 |  |  |  |  |
| Date | Owner/Agent for Owner |  |  |  |

Note:  5% Increase Next Year 1/2018

Rev. 01/01/03

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

8200 Wilshire Blvd., Suite 400
Beverly Hills, CA 90211

A true and correct copy of the foregoing document entitled (*specify*): **DEBTOR'S THIRD AMENDED CHAPTER 11 PLAN:** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**X   1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **December 14, 2016**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Todd S Garan    ch11ecf@aldridgepite.com, TSG@ecf.inforuptcy.com;tgaran@aldridgepite.com
- Alvin Mar    alvin.mar@usdoj.gov
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov

**2.   SERVED BY UNITED STATES MAIL**:  On (*date*) **12/14/2016** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**X   3.   SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **December 14, 2016**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Honorable Julia W. Brand (Via Attorney Service)
U.S. Bankruptcy Court
255 E. Temple Street, bin outside of Suite 1382
Los Angeles, CA 90012-3332

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 12/14/2016 | Sandra Rodriguez | /s/Sandra Rodriguez |
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.